## ESTATE OF THE VAN HAAGEN SOAP CO.

APPEALS BY THE THIRD NATIONAL BANK OF PHILADELPHIA ET AL. FROM THE COURT OF COMMON PLEAS NO. 1 OF PHILADELPHIA COUNTY.

Argued January 22, 1891—Decided April 6, 1891.
[To be reported.]

1. Where, at the time of receiving an advance of money, an officer of a corporation gave to the person who advanced it his individual note for the amount, the presumption is that the note was given as the consideration, and not as a security for the money.

2. It is competent, however, to rebut this presumption by showing that in fact the money was lent to the corporation for its use, that this was the understanding of all parties, and that the note given by the officer was in the nature of a collateral security.

3. In this case, it being shown that the loan was procured on behalf of the company and applied to its use, under authority so to do, and that all parties so understood the transaction, the testimony was sufficient to rebut said presumption and to charge the corporation.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 103 July Term 1890; Nos. 51, 243, 262 January Term 1891, Sup. Ct.; court below, No. 344 June Term 1887, C. P. No. 1.

On March 21, 1888, the account of John H. Connellan, assignee for the benefit of creditors of the Van Haagen Soap Manufacturing Company, was filed in the court below and referred to *Mr. William M. Smith*, as auditor, to report a distribution of the balance in the hands of the accountant.

Among those who appeared before the auditor were the National Security Bank of Philadelphia and William H. Lambert, each of whom claimed to have lent to the soap company $5,000, and the auditor was asked to allow their respective claims for the amounts of such loans.

The auditor, in his report, found that the Van Haagen Soap Manufacturing Company was incorporated June 20, 1884, with a capital stock of $50,000, divided into 1,000 shares of the par

value of $50 each; that Anthony Van Haagen was its promoter and organizer, and proposed at first that the capital should be $30,000 or $40,000; but John Hunter, then the principal stockholder and afterwards its president, objected to this, saying that the company could not make headway with a capital of less than $100,000, and it was finally agreed to organize on a basis of $50,000 capital, Hunter to advance cash to the amount of $100,000, and to retain 55 per cent of the stock, the other parties concerned to have the right to take the remaining 45 per cent if they so desired. In point of fact, however, Hunter appeared to have been the sole contributor and to have furnished all the working capital, and at the time of the failure was the owner of 99 per cent of the stock.

By the testimony adduced before the auditor, it was shown that in May, 1885, the soap company was in need of money for the purpose of buying materials; that Van Haagen, who occupied the position of superintendent, effected arrangements for the raising of $5,000 upon a loan from the National Security Bank and $5,000 upon a loan from his son-in-law, William H. Lambert; that a promissory note for $5,000, drawn by Van Haagen to the order of Hunter and indorsed by the latter, was given to the bank, which thereupon gave a New York draft to Hunter for the proceeds of the loan; and on receiving a promissory note for $5,000, signed by Hunter and drawn to the order of William H. Lambert, Lambert paid the amount of the loan made by him to J. H. Maguire, the secretary and treasurer of the soap company, who handed the money over to Hunter; that at that time all the moneys of the company were kept by Hunter, who deposited them in his individual bank account, and checked against that account when it was necessary to pay out money on behalf of the company, and that the proceeds of each of the loans mentioned were so deposited by him, and subsequently paid out for the use of the company. The notes above mentioned were renewed from time to time, payments of interest being made by the individual checks of Hunter, until some time in 1887, when both Hunter and the soap company became insolvent, and made assignments for the benefit of their creditors. The circumstances of these transactions are more fully stated, and parts of the testimony are quoted, in the opinions of the auditor, the court below, and the Supreme Court.

Auditor's Report.

The auditor, after quoting from the testimony, reported his opinion upon the claims of the National Security Bank and William H. Lambert, as follows :

Let us take the Lambert case first.   [The auditor here gave a copy of the last renewal note to Lambert.]   It will be noticed that the name of the Van Haagen soap company, the proceeds of whose assigned estate are now being distributed, appears nowhere on this paper.   The note itself is a renewal of another note of like amount, drawn precisely in the same form, which matured about the time this note was given.   That note was itself also a renewal note.   Indeed, the original note, executed and delivered to Mr. Lambert at the time he loaned his $5,000, was dated on or about the fifteenth day of May, 1885. Of this note there were altogether five or six renewals, and in none of them, as far as the testimony shows, did the name of the Van Haagen company appear either as maker or indorser. The auditor is of the opinion, therefore, that the relation of debtor and creditor was not created, and at no time existed between Mr. Lambert and the soap company.

There was some testimony given to show that Mr. Lambert was told by his father-in-law, Mr. Van Haagen, who negotiated the loan, that the $5,000 was wanted for the soap company, but it also appears that Mr. Van Haagen told Mr. Lambert that the soap company was so badly in need of the money that he was afraid that unless they could get it they would have to stop. Such information was not calculated to inspire Mr. Lambert with perfect confidence in the return of his money, should he lend it to the soap company ; but we can readily understand how he might be actuated by a friendly feeling toward the company which bore his father-in-law's name and of which he was general manager, while at the same time he would see to it that the person to whom he advanced the money would be able to repay it when it became due, whether the soap company stopped or not.   This is what your auditor thinks Mr. Lambert did ; and assurance that he did this is made doubly sure by the testimony of Mr. Hunter, to whom the money was paid by Mr. Lambert and who says that Mr. Lambert asked him whether, in case anything should happen to him (Mr. Hunter), he, Mr. Hunter, would be able to take care of the loan, to which Mr. Hunter replied " that, although he owed a great deal of money, he had enough to pay everybody, and have plenty left."

### Auditor's Report.

There was some testimony to show that a part of the money was used to buy 2,000 pounds of tallow; but if it was, it would only account for the use of about $800, and it was paid for by Mr. Hunter with a check against his private bank account, into which bank account the whole of the money was deposited and merged at the time the loan was made. Such transactions as this was are of daily occurrence. A man who lends money to another may or may not approve of the use to which his debtor intends to devote the money, but he has the right to say, before he parts with the cash, and he generally does say, upon what terms and on what security he will make the loan. When he stipulates and exacts terms and security, clearly and distinctly expressed in writing, it would be taking a great liberty with him and his contract to say that he did not mean what he had caused to be written, but he meant something else of an entirely different character.

In this case, the money was advanced upon John Hunter's individual note, at a time when Mr. Hunter's name and credit stood high and unimpeached. The collateral security for the payment of the note at maturity was 150 shares of stock of the Van Haagen Soap Manufacturing Company, of the par value of $7,500, which was John Hunter's individual property. The proceeds went into Mr. Hunter's individual bank account, and was checked against by Mr. Hunter for the benefit and business of the soap company, or whatever other object and purpose he pleased.

As has already been said, at the date of these transactions Mr. John Hunter's name and credit in the commercial world was without a blemish. He occupied the position of receiver of taxes of Philadelphia; was in receipt of a large annual salary, and was otherwise supposed to be a man of great influence and large wealth. It is very certain that at the time indicated he had not the slightest premonition of the financial and family calamity by which he was subsequently overwhelmed. It was quite natural, therefore, that individuals and banks could be found who would be willing to lend their money upon the faith and credit of John Hunter's paper, while they would be unwilling to advance it to a corporation which was admittedly hanging on the ragged edge of a stoppage of its operations.

The conclusion to which the auditor has come, therefore, is

that the claims of Mr. Lambert and the National Security Bank must be excluded from participating in the fund raised by the sale of the Van Haagen soap company's property. The testimony produced by the bank varied slightly in some respects from that produced in the Lambert case, but the differences were not such as to lead the mind of the auditor to a conclusion other than that arrived at in the case of Lambert. . . . .

Exceptions to the findings of the auditor were sustained by the court, ALLISON, P. J., in an opinion filed on April 2, 1890, in part as follows:

The rejection of these claims is mainly rested on the well-established legal principle, that where the note of a third party is taken for a contemporaneous or pre-existing debt, the presumption is that the transaction, on the part of the person receiving the note, is a merging of the debt into the note, and to the note recourse must be had for recovery. This, however, is a statement of a legal proposition without its proper qualification, which is, that this presumption may be rebutted by showing the actual intention of the parties to have been otherwise. . . . .

—After citing and quoting from Mason v. Wickersham, 4 W. & S. 100; Leas v. James, 10 S. & R. 314; Tams v. Hitner, 9 Pa. 441; Maffet v. Leuckel, 93 Pa. 468, the opinion proceeded:

The testimony clearly establishes that when each of these loans was made, the company was greatly in need of funds to enable it to carry on its business; that there was reason to fear that, if money was not speedily procured with which to purchase materials, the business could not be much longer continued. This is shown beyond contradiction by the testimony of Van Haagen, Hunter, Maguire and Lambert.

Van Haagen was dependent on his salary for his support, had no means of his own, and it was important for him that the factory should not stop. Hunter, who was the only person of financial ability connected with the concern, showed by his own testimony, and it also appears by the testimony of Van Haagen, that there was a constant demand on him for money, which he found it difficult to supply; Hunter had even authorized Van Haagen to borrow money upon his "big farm," as it is called. Hunter says: " Practically I owned all

the stock of the corporation; I was advancing money to it myself as stockholder and practical owner; it was needing money for its business; it was very much in need of money, always needing money; I don't remember especially that it was short of stock and material; it was a chronic complaint; Mr. Van Haagen had often urged upon me the importance of getting money to meet these demands." This is most strongly confirmatory of Van Haagen's testimony in relation to his interviews with Hunter preliminary to the obtaining each of these two loans, and that it was to meet an urgent necessity that he obtained the consent of Hunter to borrow each of these amounts for the use of the factory.

The auditor has not marshaled the testimony with any degree of fulness or particularity. With reference to the claim of Lambert there is a general but cursory allusion to it. The claim of the bank is dismissed with the remark that the testimony as to this claim varied slightly in some respects from that produced in the Lambert case, but the difference was not such as to lead the mind of the auditor to a conclusion other than that arrived at in the case of Lambert.

On page 9, et seq., of the testimony, will be found what Van Haagen said, when examined as a witness in support of the claim of the bank. He says: "In the early part of 1885 the company was sadly in need of money; I called on the president of the National Security Bank, stating the case of the company to him; asked him whether he thought his bank would be willing to discount a note of $5,000 for the company; he said they would; to send him my note with Mr. Hunter's indorsement; the note was sent and discounted, and Hunter sent Mr. Maguire, who was the secretary and treasurer of the corporation, to receive the proceeds of the note." He says that, before he called on the president of the bank, Mr. Gelbach, he called on Hunter, and got his consent to the transaction; afterwards, he said he thought he had spoken to Mr. Gelbach first; that this loan was solicited for neither his own nor for Mr. Hunter's private purposes; simply for the welfare of the company. Now, here is testimony of a witness whose integrity has in no way been impeached or questioned, who, as the chief actor in the borrowing of this money, in the most positive manner testifies that this was a loan to the company,

for the use of the company, and that it was not for the individual use of himself or Hunter, who were the parties to the note.

The testimony of John Hunter, when called as a witness in support of this claim of the bank, although evasive, and persistently so, is, in our judgment, most strongly corroborative of Van Haagen's testimony, in relation to this loan having been obtained for the company with the knowledge and consent of Hunter.   To the perfectly plain question, varied in form seven or eight times, as to whether Van Haagen had not called on him in June, 1885, stating the need of the company to obtain tallow and other materials, and asked witness's consent to an endeavor on his part to obtain a loan of $5,000 from the bank with which to purchase materials, an answer, yes or no, was steadily refused.   In each instance the reply was not responsive to the question, but wholly irrelevant and irresponsive to the inquiry.   To the further question, repeated in substance five times, whether, after the failure of the company, he had not said to Mr. Van Haagen and to John H. Connellan that the money received from the bank was raised to buy materials for the soap factory, and that it ought to have been made a preferred creditor, as this was borrowed money, there was the like refusal to answer yes or no, or, indeed, to make any direct answers.   There is, we think, but one proper inference to be drawn from this refusal to make proper answers to the questions propounded; and that is, that if the witness had answered according to his knowledge he would have given in each instance an affirmative reply, as the special object of the inquiries was to elicit an affirmative response; but, for a reason not disclosed, he refused to make any other than evasive statements which had no direct bearing on the several matters to which the questions pointed. . . . .

There is the further testimony of George W. Cox, the cashier of the bank, which is, that in February, 1887, John H. Maguire, the salaried treasurer of the company, presented the note for the last renewal.   In answer to the question, how the soap company were getting on, he replied, "They are doing very well, and won't want the note renewed again; this is the last time."   And to the question, "Are you positive he said the company would not require another renewal, or that

the parties would not require another renewal?" he replied he used the word company and not the parties. He did not use the word parties. Under examination by the auditor, he is reported as saying, without objection, that the president of the bank had said to him that he had loaned Van Haagen $5,000 for the benefit of the company; that Hunter and Van Haagen were the company. This is all the testimony which has any material bearing on the contract of loan made by the bank, for what purpose, for whose benefit, and under what circumstances it was made, except the testimony of John Hunter. Mr. Gelbach, at the time the testimony was taken, was dead, and it is not claimed that Maguire had any knowledge on the subject.

Hunter says this transaction was made by Van Haagen on his note at four months, to the order of John Hunter, and by him indorsed. "The proceeds of both transactions went into my account, to me personally." Upon this statement of John Hunter, considered in connection with the note and the legal effect to be given to it, the auditor mainly relies in reaching the conclusion that the claim of the bank must be excluded from the distribution. But this statement by Hunter, though strictly in accordance with the facts as they actually occurred, does not imply, nor does he say, that the loan was not to the company; that it was not made to meet its then urgent exigencies; and that his indorsement of the note was not given to the bank to secure the debt contracted for the use and benefit of the company, as testified to by Van Haagen, when he swore that he called on Mr. Gelbach, the president of the bank, stating the case of the company to him, and then asked him whether he thought his bank would be willing to discount a note for $5,000 for the company, and that he said they would, "to send him my note with Hunter's indorsement." This is so, because John Hunter was in fact the company. He owned all its capital stock, and had furnished every dollar of money that was put into the enterprise. When he said the proceeds of the note went into his individual account, to him personally, he said what was strictly true. But John Hunter was at the time not only the president of the company, he was its acting treasurer; the money of the company was paid to him, and by him deposited in his individual bank account, and out of that

account all money was drawn which, up to this time, June, 1885, was paid by Hunter to the company.

If, however, the loan, by the consent and understanding of all the parties to the transaction, was a loan to the company, and for its use, it could not change the character of the contract, that when the money was received from the bank it was handed to John Hunter, and was by him placed in his individual account. That, of course, gave him the control of the money, against which he could check as he pleased; but, as between himself and the company, it was the money of the company, which, both in morals and in law, he would be bound to hold for the objects for which it was obtained. His answer, therefore, that it was placed to his personal credit, or went to him personally, does not change the real character of the transaction in any way or in any degree.

The testimony shows that for a year after the company went into operation it had no bank account; that when money was received it was taken to Hunter to deposit in his individual account. The proceeds of the notes of Van Haagen and Lambert were given to him under the circumstances stated above. The company had a clerk and treasurer, John H. Maguire, a nephew of Hunter, but his duty as treasurer, covering the time of this loan, was to pay money received by him to Hunter, and obtain money from Hunter with which to pay the running expenses of the company.

The statement of Hunter, therefore, that the proceeds of the note given to the bank went into his individual account has no bearing on the vital question, was this a loan made to the company, and for the use and benefit of the business, or was it a personal and independent contract with John Hunter, and was his indorsement of the note of Van Haagen for his benefit? That the note, with Hunter's indorsement, was taken by the bank for its greater security, need not be questioned; but, if the contract was with and for the company, the note would stand in the transaction as a collateral security for the debt of the company. . . . .

The auditor has not given to the testimony, in so far as it relates to the claim of the bank, its due weight; nor, in view of what that testimony establishes, has he properly applied the law to the facts which in our opinion are established by the proofs;

Opinion of Court below.

namely, that this was a loan to the company, made solely for the benefit of the company, and that the money having been passed over into the hands of the acting treasurer, the presumption is that it was used for the purposes for which it was procured, the business having been carried on for several years thereafter; and, also, that the note given to the bank, drawn by Van Haagen to Hunter's order and by him indorsed, was given as collateral to the loan and to secure its return to the bank.

We are equally clear, in our judgment, that for reasons substantially similar to those which we have stated, as applicable to the National Security Bank, we are unable to agree with the conclusions of the auditor in relation to the claim of William H. Lambert. In one respect the claim of Lambert is more strongly supported by the testimony than is the claim of the bank. Both of the witnesses to the circumstances under which the loan was made have testified that it was a loan to the company. Van Haagen, who was Lambert's father-in-law, made known to Lambert that the company was short of stock; that unless money could be raised they would probably be obliged to shut down. Lambert then, according to his testimony, offered to loan them $5,000. He says, "I told Van Haagen that I would loan the company the money." Van Haagen says that, having tried to borrow money in several places, he presented the matter to Mr. Lambert and asked him if he could help "by loaning us some money;" to which Lambert replied he had $5,000 on hand which he could loan. Lambert says: "Before I saw Mr. Hunter about this loan, I told Van Haagen that I would loan the company the money." There was a subsequent interview between Van Haagen, Lambert, and Hunter at the tax office, when the matter was definitely agreed on, Hunter agreeing to give his note to Lambert for the amount. Hunter's testimony shows that at this interview, which was the consummation of the agreement previously entered into between Lambert and Van Haagen to borrow for and to loan the $5,000 to the company, he, Hunter, proposed to Lambert that he should take Van Haagen's note, or the note of the company, which Lambert refused to do. Hunter finally giving to Lambert the assurance that he was abundantly able to make the loan secure to him, under any circumstances, out of his individual estate, the money was paid to Maguire, the treasurer of the

Opinion of Court below.

company.   If this was a loan to Hunter individually, and not to the company, it is difficult to find a reason for Hunter's proposal that the note of the company should be accepted by Lambert in return for the individual debt of Hunter.   This, of itself, would seem almost, if not altogether, conclusive of the understanding which Hunter at the time had of the nature and character of the contract of the loan previously agreed on by Lambert and Van Haagen.

This money is shown by letter of Van Haagen to Lambert, of May 14, 1885, to have been paid to Maguire, who was introduced as "our secretary and treasurer," and was as such sent to receive Lambert's check for the amount, which was given to him, and which Maguire says he gave to Hunter.

The testimony of Lambert and Van Haagen is properly subject to the criticism that the former is an interested witness and the latter may be regarded as having a bias in Lambert's favor. Yet this does no more than require that their testimony should be carefully scrutinized; but, if not contradicted by other testimony in the cause and no question raised as to their veracity, the fact of interest and relationship is not a sufficient justification for rejecting what they have sworn to.   They stand in the cause unimpeached and uncontradicted.

For reasons already stated, John Hunter's affirmative answer to the leading question:  "It was an individual transaction between yourself and William H. Lambert, was it not?" does not contradict, or tend to contradict, the positive oaths of Lambert and Van Haagen, that the money was loaned to the company.   It is true, Maguire says that Lambert did not loan the company $5,000; but this is entitled to no consideration, he having no knowledge of what took place at the interviews between Van Haagen and Lambert, or the subsequent interview between Hunter and Lambert and Van Haagen at the tax office.

In addition to what we have stated, is the testimony of Hunter that this money ultimately went into the soap works company. . . . .

The exceptions to the rejection of each of these claims are sustained, and it is ordered that the distribution reported by the auditor be so amended as to allow a pro rata dividend of the fund, in the hands of the assignee, to the National Security Bank and to William H. Lambert, excepting creditors.

Arguments.

—Thereupon the Third National Bank of Philadelphia and Rutschman Brothers, creditors of the assignor, took the appeals at No. 103 July Term 1890, and No. 51 January Term 1891, respectively, specifying inter alia that the court erred:

2. In awarding any portion of the fund to the National Security Bank.

5. In awarding any portion of the fund to William H. Lambert.

7. In not confirming the auditor's report.

To Nos. 243 and 262 January Term 1891, respectively, appeals were taken by Daniel Maguire & Sons and the Fourth Street National Bank, creditors of the assignor. No separate paper-books were filed on behalf of these appellants, and the Reporter was not furnished with copies of the specifications of error filed.

*Mr. Theodore F. Jenkins* and *Mr. E. Cooper Shapley* (with them *Mr. George Northrop* and *Mr. R. C. Dale*), for the appellants:

1. The testimony shows that the National Security Bank discounted Hunter's note and carried the proceeds to his individual credit; that, as between the bank and the parties to the note, it was a personal, individual transaction, and was so considered as between Van Haagen and Hunter, because the proceeds went to Hunter, and as the note was renewed from time to time he individually paid the discount. So, also, the testimony shows that the only debtor Mr. Lambert wished to have was John Hunter, and he insisted that the note should be so drawn; and, as the auditor has found, the relation of debtor and creditor between the soap company and Lambert was not created and at no time existed. There is no evidence that either loan was made upon the credit of the company; and the fact that the company's indorsement was not taken is a circumstance evidencing the fact that the transactions were nothing more than the discounting of the notes: Ex parte Blackburne, 10 Ves. 204.

2. When the bond or note of a partner is taken as a consideration for the loaning of money for the use of a firm, "it can hardly be treated as a collateral security. It must be considered as all one transaction; and the bond is the only security

contemplated, unless perhaps there were strong and positive evidence to show an express agreement to the contrary by all parties:" North Penna. Coal Co.'s App., 45 Pa. 181. It cannot be claimed that there is such evidence in this case. If a partner borrow a sum of money and give his own security for it, it does not become a partnership debt by being applied to partnership purposes: North Penna. Coal Co.'s App., 45 Pa. 181; Bond v. Aitkin, 6 W. & S. 165; Graeff v. Hitchman, 5 W. 454. It is entirely competent for the lender to rely on the exclusive credit of the borrowing partner, and thus exonerate the firm from liability upon a contract which otherwise would bind it as being for its account and benefit: Story on Partnership, §§ 134, 136. The auditor's findings should not have been set aside. "The facts found by an auditor are conclusive unless clear mistake be shown:" Bedell's App., 87 Pa. 510.

*Mr. Edward H. Weil* and *Mr. Henry N. Paul, Jr.* (with him *Mr. S. S. Hollingsworth*), for the appellees:

1. The general rule as to the receipt of a note or check, either of the debtor or of a third party, for a debt, is unquestionably that it does not operate as a payment or satisfaction, unless expressly so agreed: Sheehy v. Mandeville, 6 Cranch 253; Hart v. Boller, 15 S. & R. 162; Davis v. Desauque, 5 Wh. 529; Weakly v. Bell, 9 W. 280; Mason v. Wickersham, 4 W. & S. 100; Leas v. James, 10 S. & R. 307; Tams v. Hitner, 9 Pa. 441; McIntyre v. Kennedy, 29 Pa. 448; Tyson v. Pollock, 1 P. & W. 376; Patton v. Ash, 7 S. & R. 116; Stone v. Miller, 16 Pa. 450. And even a higher security for a debt, given by different parties or for a different sum, will be presumed, in the absence of proof of the intention of the parties, to have been accepted as collateral security, and not in satisfaction: Jones v. Johnson, 3 W. & S. 276; Eby v. Eby, 5 Pa. 440; Eby v. Hoopes, 1 Penny. 175.

2. Some cases have recognized an exception to this rule when the note of a third party is taken for a contemporaneous debt, holding that a presumption arises that it was taken as payment, and that the debt was merged in the note. But this is only a presumption, and it may be rebutted by showing the actual intention of the parties to have been otherwise: Rew v. Barber, 3 Cow. 279; Torrey v. Hadley, 27 Barb. 196; Gordon

v. Price, 10 Ired. L. 388; Youngs v. Stahelin, 34 N. Y. 258; Bond v. Aitkin, 6 W. & S. 165; Bayard v. Shunk, 1 W. & S. 92. Indeed, many authorities are to the effect that no such presumption of payment exists: Johnson v. Weed, 9 Johns. 310; Bortch v. Atwater, 7 Conn. 409; Porter v. Talcott, 1 Cow. 359; Monroe v. Hoff, 5 Denio 362. It must be carefully noticed that, in order that the supposed exception may apply, the note must be that of a third party, and the known agent of the principal debtor is not such a third party: Everett v. Collins, 2 Camp. 515; Porter v. Talcott, 1 Cow. 382.

3. The recent case of Maffet v. Leuckel, 93 Pa. 468, discloses a state of facts precisely similar to those of the case at bar, and sustains the decree of the court below in every particular. The testimony taken before the auditor, in the present case, clearly shows that the reason for obtaining these loans was expressly stated by the borrower to be the purposes of the soap company; that the lenders understood the loans to be to the company, and that in fact the money was used by the company. From these facts, the inference is a necessary one that the loan was in fact made to the company: Maffet v. Leuckel, supra; and further facts appear which corroborate that inference. There is nothing in the fact that the lenders held no formal evidence of indebtedness from the company, to prevent their recovering upon the loans to the company under the law as we have stated it.

### THIRD N. BANK'S APPEAL.

OPINION, MR. JUSTICE CLARK:

The controversy in this case arises upon the distribution of the assets of the Van Haagen Soap Manufacturing Company in the hands of John H. Connellan, assignee for creditors, in the Common Pleas No. 1 of Philadelphia. At the hearing before the auditor, the National Security Bank of Philadelphia presented a claim for $5,000, the amount of a loan alleged to have been made to the company in June, 1885, for which the bank at the time of the loan took the note of Anthony Van Haagen, payable to the order of John Hunter, and by him indorsed. William H. Lambert also presented a claim of $5,000, a loan alleged to have been made on May 15, 1885, for which he took the note of John Hunter. Both of these notes were from time to time renewed until February, 1887, the in-

terest thereon being paid by John Hunter. Both claims were objected to on the ground that they were loans, not to the Van Haagen soap company, but to Anthony Van Haagen and John Hunter, respectively, and that there was no liability on part of the soap company to pay them. The appellees' contention, however, is that the respective loans were in fact negotiated for and on behalf of the company; and, although the notes of Van Haagen and Hunter were, for supposed prudential reasons, taken as a security for payment thereof, the company actually incurred the debt and is liable therefor; and that the claims should therefore be allowed in this distribution.

The auditor apparently determined the question of the company's liability upon the fact that upon neither of the notes did the name of the Van Haagen Soap Manufacturing Company appear, either as maker, indorsee, or otherwise; he was of opinion, therefore, " that the relation of debtor and creditor was not created, and at no time existed between these claimants and the soap company." Referring to the Lambert claim, he says, in substance, there was some testimony that the money was wanted for the soap company, but as the company was known to be in a not very promising state, he could readily understand why, although having a friendly feeling for the company, Lambert would see to it that the person to whom he advanced the money would be able to repay it when it became due. This he thinks Lambert did. "At the date of these transactions," he says, " Mr. John Hunter's name and credit in the commercial world was without blemish. He occupied the position of receiver of taxes of Philadelphia, was in receipt of a large annual salary, and was otherwise supposed to be a man of great influence and large wealth. It is very certain that at the time indicated he had not the slightest premonition of the financial and family calamity by which he was subsequently overwhelmed. It is quite natural, therefore, that individuals and banks could be found who would be willing to lend their money upon the faith and credit of John Hunter's paper, whilst they would be unwilling to advance it to a corporation which was admittedly hanging on the ragged edge of a stoppage of its operations. . . . . A man who lends his money to another may or may not approve of the use to which his debtor intends to devote the money, but he has the right to say before he

parts with the cash, and he generally does say, upon what terms and on what security he will make the loan.   When he stipulates and exacts terms and security, clearly and distinctly expressed in writing, it would be taking great liberty with him and his contract to say that he did not mean what he had caused to be written, but he meant something else of an entirely different character."   This is substantially the view taken by the auditor.   He fails to find, in any explicit form, what is the controlling fact in the cause, whether the loan of the money in each case was in fact to the company, or to the parties on the note; that is to say, whether the notes were received as a consideration for the money or as a security merely.

It is undoubtedly true, if in June, 1885, Hunter had taken the note of Van Haagen to the bank, and there had it discounted, the proceeds passing to his individual credit, without more, the bank would have been obliged to rely upon the parties to the note for payment; or, as stated in Ex parte Blackburne, 10 Ves. 204, cited by the appellants, " If there is no antecedent debt, and A carries a bill to B, to be discounted, and B does not take A's name upon the bill, if it is dishonored there is no demand, for there was no relation between the parties except that transaction, and the circumstance of not taking the name upon the bill in evidence of a purchase of the bill."   It is true, also, and the appellants contend that an analogous principle should prevail here, that if a partner borrows a sum of money, and gives his own security for it, it does not become a partnership debt merely because it is applied to partnership purposes: Graeff v. Hitchman, 5 W. 454.   " It is entirely competent for one partner to borrow money, or to buy goods, or to enter into contracts on his sole and exclusive credit with third persons; and, on the other hand, it is equally competent for them to rely on that exclusive credit, and either to refuse to contract with the firm, or to exonerate the firm from all liability upon any contract which would otherwise bind the firm as being for their account or benefit:" Story on Partnership, 134–136.   It may be, also, as was held in Bond v. Aitkin, 6 W. & S. 165, and North Penna. Coal Co.'s App., 45 Pa. 181, that where there is no antecedent debt, and the partner executes his bond, which is a security of a higher nature, as a consideration for money loaned, it would require stronger proof to establish an express agreement by parol that

the partnership was nevertheless to be held for the debt. Similar principles, perhaps, apply in certain cases to companies or corporations. "It may therefore be taken to be established," says Lindley on Partnership, 364, "that a partnership or company, not liable on a contract when entered into, does not become liable upon it by reason of having benefited by it; and, further, that a company or partnership, which has benefited by a contract not binding on it, is not to be deemed to have thereby ratified that contract, nor to have incurred an obligation quasi ex contractu, similar to that which would have been incurred if the contract had been binding on the firm or company in the first instance."

As the giving of the note was in this case contemporaneous with the creation of the debt, the presumption, we think, was that the note was discounted, or that it was given as a consideration, and not as a security for the money. But this is only a presumption of fact, and may be rebutted by showing the actual intent of the parties to have been otherwise. It is not disputed that Van Haagen and Hunter had the power to bind the company for borrowed money. It was competent, therefore, for the National Security Bank to show that the money was, in fact, loaned to the company for the company's use; that the transaction was not the discount of a note, but a loan of money to the company, the note being in the nature of a collateral security for the repayment thereof: Maffet v. Leuckel, 93 Pa. 468. In the case cited, the facts found by the referee were as, follows: Maffet & Rhoads, the defendants, during the year 1866 were partners, engaged in building a section of the Lehigh & Susquehanna railroad. Rhoads applied to the plaintiff, Leuckel, for $200, representing that he wished the same for the purpose of paying the men in the defendants' employ, and thereupon the said amount was advanced by the plaintiff, and the sum was used by Rhoads for the purpose mentioned, he giving the plaintiff his own individual note for the amount. Suit was brought, not upon the note, but for the recovery of the money advanced, and judgment was entered for the plaintiff. When the cause came here, this court, in a per Curiam said: "There was nothing in the form of the note produced in evidence to preclude the plaintiff from showing that it was given for a partnership debt; that it was

not accepted in satisfaction, but merely as a collateral security. It matters not that the making of the note was contemporaneous with the partnership debt. On the facts found by the referee we are of opinion that the judgment was right."

There can be no doubt but that the money in both cases at bar was borrowed for the use of the company. Both loans were solicited in the first instance by Van Haagen, to provide means for the purchase of stock and materials for the company. It is of no consequence that the money was put to the credit of John Hunter, for John Hunter was the company's banker: he owned practically all of the stock, and the company's funds were, up to that time at least, supplied from and deposited in his private account. The testimony of Van Haagen, Lambert, and Connellan, in the one case, and of Van Haagen, Maguire, Connellan, and Cox, the cashier, in the other, is clear and convincing on this point. The only contradiction is by John Hunter, whose answers to questions put to him are so manifestly equivocating and evasive as to render his testimony very unsatisfactory. But, from the tenor of the testimony as a whole, there can be no conclusion of fact more clear than that both these loans were effected for the use and benefit of the Van Haagen Soap Manufacturing Company. It is equally clear, not only from what occurred at the time, but before and after, that this was the understanding of all the parties concerned; not only of Van Haagen, Hunter, and the soap manufacturing company on the one side, but of the bank and Lambert on the other; and also that the money ultimately went into the company, and was used in the business. It is unnecessary for us to refer in detail to the evidence. In so doing, we would be obliged to extend the bounds of this opinion to an undue extent. What we have said is the result of a careful study of the testimony, and it is only required that we should state our conclusions.

In rebuttal of the presumption which is supposed to arise in such a case, we have, to begin with, the fact that the loans were for the company's use, that all the parties concerned so understood it, and that the money was in fact so applied. As to the contemplated liability of the company to repay the debt, we may, in addition to what has already been said, refer briefly to the testimony. The bank officers regarded Van Haagen and

Hunter as the company.  Mr. Gelbach, at the time of the loan, when Cox, the cashier, expressed surprise that the company's name was not on the paper, replied that the parties to the note were the whole company.  When Maguire came to renew the note, the last time, he asked Cox if the bank would be willing to renew it.  Mr. Cox inquired how the soap manufacturing company was getting along.  Maguire replied that they were getting along very well, and that the "company" would not want the note renewed again; that this was the last.  Mr. Connellan, the assignee, testifies that shortly after his appointment as assignee, in June, 1889, he had a conversation with Mr. Hunter in the president's room of the Keystone National Bank, and that Hunter said he was very sorry for the National Security Bank; that they had been very kind to him, and the note which they discounted at the request of Mr. Van Haagen was really for the benefit of the Van Haagen Soap Manufacturing Company, and should be a claim on the fund in his hands as assignee.. "He also told me," says Mr. Connellan, "there was another note, which had been given to Mr. Van Haagen's son-in-law, Mr. William H. Lambert, and that that should also be a claim on this fund.  I told him that I had been over the books of the company, and that, on the face of the matter at least, the company was not liable for this loan.  He said that Mr. Lambert, at the time he took this note, thought that he, Mr. Hunter, was stronger than the company, and that that was why the note was signed that way instead of the company's note being given."

That the notes were taken for greater security than if signed by the company cannot be questioned, but if the contract was with and for the company the notes would stand as a collateral security for the company's debt.  The learned judge of the court below was of opinion that the testimony was sufficient to rebut the presumption that the notes were taken as a consideration for or in payment of the debt, and we are satisfied that he was right.

> The decree of the Common Pleas is affirmed, and the appeal dismissed at the cost of the appellants.

—For the reasons given in the foregoing opinion, the decree of the Common Pleas was affirmed in the appeals of Rutschman Bros., Maguire & Sons, and Fourth St. National Bank.