STATE EX REL. CRAIG, STATE BANK EXAMINER, v. MUTU-
AL SAVINGS BANK AT BENNETTSVILLE ET AL.
LIBERTY NATIONAL BANK OF SOUTH CAROLINA AT CO-
LUMBIA v. McCOLL ET AL.

(133 S. E., 901)

1. BANKS AND BANKING—INSOLVENT BANK HELD NOT LIABLE ON NOTE TO WHICH IT IS NOT A PARTY, FORWARDED TO AND PAYABLE TO CORRESPONDENT BANK SECURED BY WAREHOUSE RECEIPTS FOR COTTON PAYABLE TO CORRESPONDENT BANK, IN VIEW OF INSUFFICIENT EVIDENCE TO SHOW INTENTION OF INSOLVENT BANK TO BE LIABLE THEREON (ACT 1914 [28 ST. AT LARGE, PAGE 673], § 18; CIV. CODE 1912, § 3737).—Under Act 1914 (28 St. at Large, page 673), § 18, insolvent bank is not liable on note to which it is not a party forwarded to and payable to correspondent bank without indorsement and secured by warehouse receipts for cotton payable to correspondent bank, in view of insufficient evidence to show that insolvent bank intended to be liable on note, if such could be shown without evidence in writing under Civ. Code 1912, § 3737.

2. BANKS AND BANKING.—Letter written by cashier, before insolvency of bank, authorizing correspondent bank to charge notes for which renewals had not been sent, was only authority until revoked, which occurred on insolvency and receivership.

3. BANKS AND BANKING.—Bank forwarding note, secured by warehouse receipt of cotton, can be held liable as on warranty that warehouse receipt was good only in so far as warranting that paper was obligation of warehouse company.

Before SHIPP, J., Marlboro, September, 1923.    Affirmed.

Proceeding by the State, on the relation of James N. Craig, State Bank Examiner, against the Mutual Savings Bank at Bennettsville, and T. B. McLaurin and others as

directors, wherein the Liberty National Bank of South Carolina at Columbia filed a claim, opposed by H. L. McColl and another as the receivers of the Mutual Savings Bank. Judgment denying the claim, and the Liberty National Bank appeals.

The report of the Special Referee, the decree of the Circuit Court and a letter referred to therein are as follows:

### REFEREE'S REPORT

This is an issue which has arisen in the winding up of the Mutual Savings Bank, by the receivers appointed by this Court, between the receivers and the Liberty National Bank.

At the date of the insolvency the Mutual Savings Bank had on deposit with the Liberty National Bank something over $6,000.00, and owed said bank a note of $10,000.00 secured by various collateral notes. The Liberty National Bank also held a note for $10,000.00 signed by McLaurin & Co., and secured by a warehouse receipt of the Bennettsville Warehouse Company for 100 bales of cotton. After the insolvency of the Mutual Savings Bank, the Liberty National Bank applied the deposit standing in the name of the Mutual Savings Bank to the McLaurin & Co. note, claiming that this latter note was an obligation of the Mutual Savings Bank, and then filed its claim with the receivers for the indebtedness of the Mutual Savings Bank on the basis of this McLaurin & Co. note being an obligation of the Mutual Savings Bank. The receivers deny that the McLaurin & Co. note is any obligation of the said the Mutual Savings Bank at all, and deny that the Liberty National Bank had any right to apply the Mutual Savings Bank deposit to that note, and called upon the Liberty National Bank to establish its claim, as is required by the order of the Court in this case, providing for the proof and establishment of the claims against the insolvent the Mutual Savings Bank.

Inasmuch as the contest before me was as to the liability of the Mutual Savings Bank on this note, I will in this report devote myself only to that question. A decision of that question will automatically determine the right to apply the deposit, and since there seems to be no dispute as to amounts, etc., I have no doubt that the correct amount of the claim will then be readily agreed on by the parties. There may be other differences which may arise. If there are any such I will, of course, take up the matter again. I have no doubt, however, that with the legal rights established the details will work themselves out.

I held a number of references and took the testimony of the witnesses produced, and herewith hand up the same as part of this report, along with the numerous written exhibits introduced.

The Liberty National Bank was formed by the merger of the People's National Bank and of the Union National Bank some years ago, that is, in 1919. Prior to that time the Mutual Savings Bank of Bennettsville, S. C., had done business with the Union National Bank and continued its relations with the Liberty National Bank, borrowing money, sending and receiving collections, and, seemingly, acting as the correspondent of the Liberty National Bank, and having such relations as banks usually have with those banks they do business with.

The particular note involved in this issue, is that of McLaurin & Co., seems to be one of a class which was not handled as the usual notes were between banks. These notes all were secured by warehouse receipts for cotton, and were made payable not to the Mutual Savings Bank but to the foreign bank to whom the Mutual Savings Bank sent them. Certainly, in so far as the particular note involved in this issue is concerned on its face, there is no connection shown with the Mutual Savings Bank. The note is signed by McLaurin & Co., per T. B. McLaurin, is payable to the Liberty National Bank, and is secured by a warehouse receipt for

one hundred bales of cotton.    The warehouse receipt attached also does not show any connection with the Mutual Savings Bank, being issued by the Bennettsville Warehouse Company to McLaurin & Co., and indorsed by the payee in blank.    So that something else than the note must be produced to show any responsibility by the Mutual Savings Bank for the note.

A mass of correspondence covering a period of some four years and relating to various different transactions between the Mutual Savings Bank and the Liberty National Bank and its predecessor, the Union National Bank, was introduced in evidence, most of it is, in my opinion, irrelevant, having to do with other transactions, contracts, and parties.    The purpose of the testimony was to establish by a course of dealing what is lacking in concrete proof, that is, the obligation on the part of the Mutual Savings Bank to make good the McLaurin & Co. note.    In the nature of things during a period of business activities covering a period so long, there must have been many transactions and many settlements dictated very probably by the circumstances surrounding the parties at the time, and I would not think that the obligations of the parties to this particular contract could safely be deduced from them.    Indeed, I have looked over the various transactions, and I do not find where the questions of the liability of the Mutual Savings Bank to make good any other notes ever arose in connection with any of these settlements.    They were all made in a manner that was as consistent with the theory of the bank's nonliability as with the theory of its liability on these various notes.

The concrete point of inquiry facing the Court is: Is the Mutual Savings Bank liable on the note of McLaurin & Co. to the Liberty National Bank?    I have noted that by its terms there is no indication of such liability, but that, on the contrary, the Mutual Savings Bank is not a party to the note so that legal responsibility could

not be based on the instrument itself.   Acts 1914, page 673, § 18.   And I have further noted that I do not find in the course of dealing sufficient evidence to show liability, if, indeed, such can be shown without evidence in writing as prescribed by the Statute of Frauds (Code 1912, Vol. 1, § 3737).   *Dow v. Swett,* 134 Mass., 40; 45 Am. Rep., 310.

I do not think there is any doubt that the Mutual Savings Bank was concerned in the transaction.   The fact that T. B. McLaurin, president, managed the entire matter, would not release the Mutual Savings Bank, if what was done would otherwise render it responsible.   All these cotton loans—of which this was only one—seem, as a matter of fact, to have been handled by him alone.   They were secured by warehouse receipts on the cotton, were made direct by the customer to the foreign bank, and were not carried on the books of the Mutual Savings Bank at all as an obligation to or of the bank.   The notes were forwarded to the payee bank, which remitted to the Mutual Savings Bank, which then paid or credited the maker.   If there was any difference in the discount charged the Mutual Savings Bank made it. In the matter of this particular note, the loan originally was made in May, 1920.   The Liberty National Bank credited the account of the Mutual Savings Bank with $10,000.00, less $177.00 or $9,823.00.   See Exhibit K. The Mutual Savings Bank on its part credited to McLaurin & Co. $10,000.00, less $200.00, for $9,800.00, making $23.00 by the transaction.   See deposit slip attached to Exhibit L. If that were the test of liability, undoubtedly the Mutual Savings Bank would be liable.   But I do not think that this is the correct test.   There are daily many business transactions in which notes, bonds, drafts, and other commercial paper are transferred, negotiated or floated to the profit of those handling them without their incurring any liability thereupon.

If it was intended that there should be such responsibility it would seem that it would have somewhere been definitely

28—S. C.—135.

stated.   The usual way would have been for the Mutual
Savings Bank to have become a party to the paper.   And
when we consider that the parties are banks, which are sup-
posed to use a high degree of care in the conduct of their
business, and do not find any such definite proof, the natural
conclusion is that there was no intention that the Mutual
Savings Bank should be responsible.   On the other hand, the
note was apparently fully secured by a warehouse receipt.
for cotton, so that there was no need of any recourse upon
the Mutual Savings Bank or any reason to demand any ad-
ditional strength for the paper.

But besides this, it is especially significant that neither of
the parties seem to have regarded the Mutual Savings Bank
as liable on it prior to the debacle of the Mutual Savings
Bank.   The latter bank did not carry it among its obligations,
and when it closed and the Bank Examiner was investigating
its affairs to ascertain its standing, the Liberty National
Bank did not list it as a liability as it did the direct note
given it by the Mutual Savings Bank.   See the testimony of
Adams, pages 18, 19, 23, 24.   And Mr. Adams testifies also
that the Liberty National Bank never, prior to the Mutual
Savings Bank's collapse, rendered a statement showing that
it claimed the Mutual Savings Bank to be liable on this note.

But what seems to me to be conclusive of the question is
the fact that these notes—this as well as the other of this
class of cotton notes—were handled this way so as to dis-
count them with the Federal Reserve Bank.   The Mutual
Savings Bank was not a member of the Federal Reserve
system, and no paper of a bank not a member is received
for discount by the Federal Reserve Bank.   I think the
policy of that bank as to agricultural paper is so well known
that I can say that paper of the kind classed in this case as
cotton loans, of which class this note was one, was especially
desirable for use with that bank.   At all events, as Mr. Man-
ning himself testifies, the McLaurin & Co. notes were used
with the Federal Reserve Bank and were drawn in this man-

ner so that they could be so handled.   Now, if it was really
an obligation of the Mutual Savings Bank, then the parties
were guilty of a subterfuge and broke faith with the Federal
Reserve Bank: If, on the other hand, the paper was what
it appeared to be, what the method of handling by both par-
ties indicated, it was a perfectly legitimate course of dealing.
These notes, and this one in particular, were supposed to be
fully secured by the warehouse receipt, and there was, in the
opinion of the banks, no need of the support of the Mutual
Savings Bank's guaranty.

I, therefore, conclude that the legitimate and not the ille-
gitimate course was intended, and that the Mutual Savings
Bank was not in fact nor intended to be liable on the notes.
I think, moreover, that both Mr. Manning's testimony and
the letters to him from the Federal Reserve Bank show this.
If the Mutual Savings Bank was intended to be liable on the
note then the natural thing was that they should be parties
to the paper.   If, however, they were, as a matter of fact,
handled this way, in order to circumvent the Federal Re-
serve Bank and obtain their discount privileges, and yet at
the same time retain the liability of the Mutual Savings
Bank, then it would seem to be probable that there would be
some agreement made and kept to show that liability.   Both
Mr. Manning and Mr. Rogers, as if in recognition of this,
do claim specific authority in the letter written, Mr. Man-
ning says, by the president of the Mutual Savings Bank to
the Union National Bank (see the testimony, page 14), and
Mr. Rogers says in the letter of date October 15, 1918,
signed by Barrentine, cashier (see his testimony, page 11).
They both evidently referred to the same letter—that is,
Exhibit No. 5.

I do not find in this letter the assumption of liability.
This letter was written more than two years prior to the
transaction in question, was signed by the cashier (who was
no longer an officer or in the employment of the bank at the
time of the matter involved, and since the letter was written

the Liberty National Bank itself had come into existence), and at most was only permission or license to charge up notes, for which renewals had not been sent, to the Mutual Savings Bank. There are a number of letters introduced showing that neither bank rested on this authority. Take, for instance, these very McLaurin & Co. notes—on May 11, 1920, the Liberty National Bank writes (see Exhibit L, yellow copy of letter marked "119") to the Mutual Savings Bank that the note of McLaurin & Co. for $2,500.00 was due and overlooked; then see letter of Mutual Savings Bank giving them authority to charge it (dated 5–12–20, and paper marked "118" and attached to Exhibit 35) ; then see Exhibit 19, in which the Liberty National Bank reports that it has done so. See the two letters dated April 1, 1920, attached to the above letter or see letter dated May 24, 1919, Exhibit L. All completely negative the idea that the above authority was regarded as binding or as having reference to all subsequent notes that might be given to the Union National Bank or its successors. These letters are taken almost at random from those introduced.

But, granting to the letter its claimed construction, it was only authority until it was revoked. The Liberty National Bank did not act in this case on it until the insolvency and receivership and consequent revocation of the authority. But I do not think it could be given such a construction anyway.

This, I believe, practically disposes of the case. There were other points made in the argument. For instance, that the Mutual Savings Bank was liable as on warranty that the warehouse receipt was good. All that the Mutual Savings Bank could be held to have warranted was that the attached paper was the obligation of the Bennettsville Warehouse Company, and there is no dispute that it is. The receivers of the warehouse admit this and further admit the claim proved by the Liberty National Bank against the warehouse company. So that, even if this guar-

anty were shown, and, as I have noted above, there is no evidence of it, it has been fulfilled.

I, therefore, find and so report: As to the facts, that the note of McLaurin & Co. was not indorsed by the Mutual Savings Bank; that it was not the intention of the parties that the said bank should be liable on this note and that there was no agreement to such effect. As to the law, that the receivers of the Mutual Savings Bank are not liable to the Liberty National Bank on this note, and that the application of the credits of the Mutual Savings Bank to this note was not and should not be allowed and should be corrected.

DECREE

This report was duly excepted to by the Liberty National Bank and the following decree was filed:

"This matter comes before me on exceptions to the report of H. J. Riley, Esq., Referee. The Referee has made a full and clear statement of the matters in controversy and it is not necessary to repeat them here. I have considered carefully the report of the Referee, the testimony, and the exceptions. I am so well satisfied with the report of the Referee that I adopt it as the judgment of the Court. Ordered that the exceptions be, and the same are, overruled, and that the report of the Referee be, and the same is, made the judgment of the Court.

A letter from the Mutual Bank, as follows, was indentified and placed in evidence:

The Mutual Savings Bank

Bennettsville, S. C., October 15, 1918.

Union National Bank, Columbia, S. C.—Gentlemen: Please charge $5,000.00 note of McLaurin Co. due 10-12-18, to our account, and all other notes that come due in the future, unless we get renewal note to you before due date. The inclosed notice is not correct. The note is not past due. Please answer letter we sent to you on Sept. 5th concerning your last statement of our account. Unless you gave us credit for items mentioned in our letter of said date your

statement is incorrect. Your prompt attention to this matter
we will appreciate.

Yours very truly,

The Mutual Savings Bank

Per J. C. Barrentine, Cashier.

*Messrs. Sloan & Sloan,* for appellant, cite: *Correspondence
to show course of dealing and evidence of similar transactions
competent to show authority of agent:* 55 S. C., 568; 41 S.
C., 300; 104 U. S., 192; 174 F., 752; 27 C. C. A., 120; 72
N. Y., 286; 53 A. S. R., 467; 7 C. J., 527. 1 Michie on
Bank & Banking, Sec., 113. *Quasi contracts:* 81 S. E., 313;
74 S. C., 221; 34 S. C., 255; 24 Ill., 637; 65 Ohio St., 104;
184 Ind., 228; 41 Mont., 417; 82 N. J. L., 44; 51 N. H., 402;
29 Pa., 465; 70 Vt., 536; 120 S. W., 183; 218 N. Y., 400.
*Party assuming liability for advancements to another is
bound:* 104 S. C., 218; 85 S. C., 94; 175 N. Y., 260; 4
Sneed (Tenn.)), 48; 57 Mont., 340; 37 Ala., 577; 157; N.
C., 427; 141 U. S., 479; 180 S. W., 959; 174 Mo. App., 692;
43 Okl., 348; 6 R. I., 103. *Original undertaking may be
implied from circumstances:* 87 Ill., 118; 201 Ala., 331;
158 Pa., 513. *Undisclosed principal liable for debt con-
tracted by agent, though not liable on note given by agent:*
130 Ga., 807; 44 N. E., 97; 12 L. R. A., 223; 125 Mass.,
439; 116 N. Y., 625; 156 Ill., 149; 21 L. R. A. (N. S.),
1051; 12 L. R. A., 223 and note; 8 C. J., 168. *Agent may
bind himself and principal by contract:* 65 S. C., 259; 35
S. C., S. C. L., 213; 126 Tenn., 380; 129 Ga., 479; 200 N.
Y., 18; 21 Gratt. (Va.), 440; 42 W. Va., 18; 114 Ala., 377;
58 S. W., 789. *Equity regards substance, not form:* 21 C.
J., 204; Pomeroy's Eq. Juris, 2nd Ed., Sec. 378. *Guaranty
defined:* 71 S. C., 287; 22 S. C., 555. *Liability of Guarantor:*
71 S. C., 287; 69 S. C., 172. *Words held to be contracts
of guaranty:* 87 S. C., 199; 68 S. C., 13; 28 S. C., 506; 211
Ill. App., 278; 202 S. W., 447. *Continuing guaranty:* 87 S.
C., 199; 28 C. J., 897. *Actions for money had and received;
promise to pay implied:* 73 S. C., 83; 59 S. C., 81; 35 S. C.,

187; 27 Cyc., 860. *Elliott on Contracts,* Secs. 1374 and 1378. *Principal liable for frauds of agent committed within scope of his employment:* 82 S. C., 173; 76 S. C., 211; 39 S. C., 28; 37 S. C., 377; 13 S. C., 5; 163 Ky., 111; 166 Cal., 386; 14 C. J., 493; I Michie on Banks and Banking, Sec. 112. *Where one of two innocent parties must suffer:* 100 S. C., 452; 92 S. C., 329; 13 S. C., 18; 86 Pa., 84; 172 N. W., 603; 100 A. D. (N. Y.), 452; 100 A. D. (N. Y.), 82. *Member Federal Reserve system prohibited to act as agent of non-member bank in obtaining discounts from a Federal Reserve Bank:* Act of Congress, Dec. 23, 1913, as amended by Act August 15, 1914, and by Act June 21, 1917, 40th U. S. Stat. at Large, 239. *When Court will enforce claim based on illegal or immoral contract:* 94 S. C., 236; 73 S. C., 1; 28 S. C., 463; 13 C. J., 441. *Liens sought to be enforced are proper:* 83 N. Y., 338; 13 L. R. A., 315; 98 C. C. A., 478; 174 F., 752; 31 Cyc., 821. *Credit account of insolvent bank properly offset against liabilities of said bank:* 101 S. C., 457; 96 S. C., 74; 92 S. C., 445; 7 C. J., 654. *Receiver has no higher rights than insolvent bank:* 101 S. C., 457; 34 Cyc., 193; 7 C. J., 502.

*Messrs. McColl & Stevenson,* for respondents, cite: *Great weight due finding of referee concurred in by Circuit Judge:* 123 S. E., 674; 103 S. C., 307; 88 S. E., 354; 101 S. C., 362; 85 S. E., 900; 100 S. C., 157; 84 S. E., 532; 91 S. C., 473; 74 S. E., 1072. *What persons are liable on negotiable note:* 18 S. C., 282; Civil Code, 1922, Sec. 3669. *Cotton loans may be unlimited in amount:* Civ. Code, 1922, Sec. 4000. *Agent not liable on contract for disclosed principal:* 92 S. C., 415. *Principal not liable for fraud of agent where principal was also defrauded:* 50 S. C., 259. *Question not passed on by referee or Circuit Judge not available on appeal:* 18 S. C., 288.

May 6, 1926.

The opinon of the Court was delivered by MR. JUSTICE WATTS.

The reasons given by the special referee, H. J. Riley, Esq., confirmed by his Honor, Judge Shipp, are satisfactory to us. It is the judgment of this Court that the judgment of the Circuit Court affirmed.

MESSRS. JUSTICES GARY, BLEASE and STABLER, concur.

MR. JUSTICE COTHRAN (dissenting): This case involves the validity of a claim filed by the Liberty National Bank of Columbia in the winding up of the affairs of a stranded bank, Mutual Savings Bank of Bennettsville. The latter bank closed its doors on November 8, 1920, and an order of Court, appointing H. L. McColl and E. P. Miller receivers, was filed November 23, 1920, in the case entitled James N. Graig, State Bank Examiner, against Mutual Savings Bank.

In the course of the administration of the bank's affairs by the receivers, the Liberty National Bank filed with them two claims against the bank:

(1) A note signed by the Mutual Savings Bank, payable to Liberty National Bank, for $10,000, dated November 1, 1920, due December 1, 1920, purporting to be secured by sundry collaterals aggregating $18,076.77.

(2) A note signed by McLaurin & Co., payable to Liberty National Bank, for $10,000, dated August 10, 1920, due November 8, 1920, purporting to be secured by warehouse receipts for 100 bales of cotton, issued to McLaurin & Co. by Bennettsville Warehouse Company, on May 12, 1920. This note was a renewal of a previous note for the same amount, dated May 12, 1920, and due August 10, 1920.

One T. B. McLaurin was president of the Mutual Bank and of the Bennettsville Warehouse Company and was manager of and operated the business of McLaurin & Co. The Bennettsville Warehouse Company was adjudged insolvent and was placed in the hands of receivers on December 10, 1920. T. B. McLaurin was about the same time adjudicated a bankrupt.

At the time of the triple collapse, the Mutual Bank had to the credit of its deposit account with the Liberty National

Bank $6949.12, which the Liberty Bank claimed the right to apply to the McLaurin & Co. note second above described.

There is no controversy as to the liability on the $10,000 note of McLaurin & Co., to the Liberty Bank, also described above, except as to the matter of attorney's fees, which the referee disallowed. The main contention is as to the liability of the Mutual Bank on account of the $10,000 note of McLaurin & Co. to the Liberty Bonk, also described above. The warehouse receipts for 100 bales of coton, put up by McLaurin & Co. as security for their $10,000 note to Liberty Bank, proved to have been fraudulently issued by T. B. McLaurin, president of the Bennettsville Warehouse Company; no cotton as represented by them having ever been in the warehouse.

The matter was referred to H. J. Riley, Esq., as Special Referee. He filed a report disallowing attorneys' fees on the direct note of the Mutual Bank to the Liberty Bank, holding that the McLaurin & Co. note was not a liability of the Mutual Bank, and denying the right of the Liberty Bank to apply the deposit of the Mutual Bank to the Mc-Laurin & Co. note, or to hold the excess collateral towards liquidation thereof. Upon hearing the exceptions to the report of the Special Referee, his Honor, Judge Shipp, filed a decree confirming the report in general terms. The Liberty Bank has appealed.

My conclusion is that the Mutual Bank is liable to the Liberty Bank for the amount represented by the $10,000 note, and that its liability may be placed upon either of the following grounds:

(1) That the credit was extended to the Mutual Bank, and the note of McLaurin & Co., secured by the indorsement of the warehouse receipts, was taken by the Liberty Bank only as collateral to its advance of the money.

(2) That the money was obtained by the Mutual Bank through the fraud of its president, in attaching to the note

of McLaurin & Co. bogus warehouse receipts as pretended collateral security.

1. As to the first ground: That the credit was extended to the Mutual Bank and the note of McLaurin & Co., secured by the indorsement of the warehouse receipts, was taken by the Liberty Bank only as collateral to its advance of the money.

The Special Referee very correctly states that, in so far as the McLaurin note of $10,000 is concerned, upon its face it discloses no connection between the Liberty Bank and the Mutual Bank. It is signed by McLaurin & Co., per T. B. McLaurin, and is made payable to the Liberty Bank, secured by indorsement of warehouse receipts issued by Bennettts-ville Warehouse Company to McLaurin & Co. for 100 bales of cotton. The warehouse receipts, of course, disclose no connection between the banks named. Notwithstanding, it is not legally impossible that previous dealings between the banks, and a dealing with this particular note, may develop a liability of the Mutual Bank for the amount represented by it, as I think they do.

The McLaurin Co. note was one of a long series of transactions between the Mutual Bank and the Union National Bank, predecessor of the Liberty National Bank, which transactions are referred to as "cotton loans,'" handled by the Mutual Bank with a great number of its customers. They began as far back as 1915, and continued through the years up to and including the year 1920. In 1919 the Liberty Bank was formed by the merger of Union National Bank and the People's National Bank. Thereafter the Mutual Bank continued its relations with the consolidated bank, the Liberty National Bank, borrowing money from it, sending and receiving collections and acting as its correspondent.

The method of handling these "cotton loans" for its customers, by the Mutual Bank, which was interested in securing the deposits of its customers, maintaining their

confidence and good will, and making for itself the difference
between its discount rate and that of the Liberty Bank, was
to make the notes payable directly to the Liberty Bank,
transmit them to that bank to be discounted, and the proceeds
placed to the credit of the Mutual Bank.  The reason for
so handling them is thus explained in the report of the
referee, to which no exception has been taken, for the reason
that it so clearly appears from the evidence:

"But what seems to me to be conclusive of the question is
the fact that these notes—this as well as the others of this
class of cotton notes—were handled this way so as to dis-
count them with the Federal Reserve Bank.  The Mutual
Savings Bank was not a member of the Federal Reserve
system, and no paper of a bank not a member is received for
discount by the Federal Reserve Bank * * * At all events,
as Mr. Manning (an officer of the Liberty Bank) himself
testifies, the McLaurin & Co. notes were used with the
Federal Reserve Bank, and were drawn in this manner so
that they could be so handled."

After this distinct and emphatic finding that the arrange-
ment was a subterbuge, as to which I have not the slightest
doubt, the referee states the hypothesis that, if such was
the intention of the Mutual Bank, "the parties were guilty
of a subterfuge and broke faith with the Federal Reserve
Bank."

Instead of holding, as I shall endeavor to show he should
have held, that, the arrangement being a subterfuge, as he
had so distinctly found, the Mutual Bank was as liable as if
it had signed the note or indorsed it to the Liberty Bank,
he abandons his finding that it was a subterfuge, and holds
that it was a perfectly legitimate transaction, in which the
Mutual Bank had no part, and with which it was not con-
nected; a conclusion directly in the teeth of his former find-
ing.

The McLaurin & Co. note in question, which handled
in accordance with the method and with the intent and

purpose indicated, was executed originally on May 12, 1920, and was inclosed to the Liberty Bank for discount by the Mutual Bank, in its letter of May 12, 1920, in which it is stated:

"We know that funds are tight and we will not ask for additional loans other than this."

The note was discounted and the proceeds placed to the credit of the Mutual Bank. The deposit account of the Mutual Bank with the Liberty Bank, as of May 12, 1920 (the date on which the note was discounted), and as of May 13, 1920 (the following day), shows that before the note was discounted the Mutual Bank was charged with an overdraft of $5,421.59; that on May 12th additional items of debit were entered upon the account, aggregating $6,187.-68; of this additional sum, $2,500 was for a McLaurin & Co. note of that amount past due and directed to be charged against the account of the bank, and $3,601.43 was for a check of that amount drawn by the Mutual Bank in favor of Federal Reserve Bank; these with two small debit items, added to the overdraft of $5,421.59, swelled the overdraft to $11,609.27. Against this overdraft there was a credit of $9,823, the proceeds of the $10,000 note (less the discount and stamps of $177), leaving still an overdraft of $1,786.27. On the next day, May 13th, the account was further charged with checks drawn by the Mutual Bank, aggregating $9,469.74, making the overdraft on that day of $11,256.01. These facts indisputably show that the Mutual Bank actually received from the Liberty Bank and disbursed for its own uses the entire proceeds of the $10,000 McLaurin & Co. note.

On May 26th, the Mutual Bank forwarded another note of McLaurin & Co., for $10,000 for discount by the Liberty Bank, stating:

"We did not mean to ask any further accommodation but this cotton loan we would like to get carried, as cotton is

STATE EX REL. CRAIG v. MUTUAL SAVINGS BANK    433

sold to be delivered. I know rates are high and charge us 8 per cent."

The Liberty Bank declined the loan, stating:

"We understood from your previous letter that you would not expect further credit accommodation, and we also find that we have already been liberal with you in proportion to the average collected balances which your bank has been maintaining with us."

On August 10, 1920, the note which had been executed on May 12th fell due. The Mutual Bank mailed a renewal note, in a letter dated August 11, 1920, in which it was stated:

"We beg to inclose renewal note for $10,000, and will you charge interest to our account on this note? We over-loooked due date and regret error on our part."

Upon this proposition the note was renewed and made payable November 10, 1920; it was signed as the other note was signed, "McLaurin & Co., by T. B. McLaurin."

On November 8th, two days before the note fell due, the Mutual Bank closed its doors and was taken in charge by the bank examiner. On November 23d, the bank, the warehouse company, and McLaurin & Co., having all been utterly wrecked by T. B. McLaurin, the bank was, by the order of the Court in the main cause, placed in the hands of the receivers.

While the name of the Mutual Bank is not physically connected with the note, I do not think that there can be a doubt but that it was the actual applicant for the loan, and, but for the difficulty in rediscounting the note, the Mutual Bank would have taken it in its name and indorsed it over to the Liberty Bank. It was so understood by all the parties and the proceeds of the note were handled exactly as they would have been had the note been taken in the name of the Mutual Bank.

Mr. Manning, president of the Liberty Bank, testified:

"The note in question was entirely a part of the line of

credit of the Mutual Bank; we did not know the customers at all." "These notes were payable to the Liberty Bank and did not bear the indorsement of the Mutual Bank, and were always placed to the credit of the Mutual Bank and charged to their account at maturity."

Mr. Rogers, cashier of the Liberty Bank, testified:

"The proceeds of the loans were placed to the credit of the Mutual Bank, which paid the interest on them on renewal. On payment the original notes were forwarded to the Mutual Bank and notices of maturities were also sent to the Mutual Bank; they were a part of the line of credit of the Mutual Bank; we did not know the individuals; the Mutual Bank did not indorse them."

He produced two letters from the Mutual Bank dated in 1918, in which the bank wrote:

"Please charge $5,000 note of McLaurin & Co., due 10/12/18, to our account, and all other notes that come due in the future, unless we get renewal note to you before due date"; and "we have instructed you to charge all such notes to our account on the day they become due, unless a renewal note reaches you before due date" (a course of dealing utterly inconsistent with the theory that the Liberty Bank was discounting the notes for the accommodation of the makers, and looked to them alone for payment).

The cashier testified further:

"After these letters were received all of these notes when they fell due were charged to the account of the Mutual Bank. These cotton notes were handled for the Mutual Bank; we did not have any correspondence or dealings with the makers; the Mutual Bank got the proceeds and we looked to them for payments; the notes were a part of the line of credit of the Mutual Bank, which depended on the balance they carried with us."

If this transaction were to be construed according to the circumstances surrounding it alone, I have not the slightest doubt but that the purposes of the Mutual Bank was to put

up its credit with the Liberty Bank and for its purposes procure an advancement. But, as the evidence overwhelmingly shows, it was but a sample of scores of other transactions, which conclusively show that in every case the credit was extended to the Mutual Bank, and that the notes of its customers were put up simply as collateral security. The makers of the notes did not apply to the Liberty Bank for loans; they applied to the Mutual Bank; and manifestly that bank would have honored the applications if they had had the money; not having it the only recourse was by rediscounting the notes with some other bank. Ordinarily the Mutual Bank would have had these notes made payable to itself, and then by indorsement have had them rediscounted by some other bank. The Liberty Bank was the bank with which the Mutual Bank did business, and naturally that bank was looked to. The Liberty Bank also looked to other banks for assistance in such transactions by rediscount. It was a member of the Federal Reserve system, while the Mutual Bank was not. The Federal Reserve Bank would not rediscount paper made or indorsed by a nonmember bank. Hence the arrangement was made, a substitute for the normal method, that the Liberty Bank should advance the necessary funds to the Mutual Bank, as long as its line of credit continued good, accept the notes of its customers made payable to the Liberty Bank, rediscount those notes and place the proceeds to the credit of the Mutual Bank, which was done in every instance.

A review of the prior transactions between the Mutual Bank and the Union National Bank, predecessor of the Liberty Bank, and between the Mutual Bank and the Liberty Bank after the consolidation of the Union Bank and the People's Bank into the Liberty Bank, abundantly demonstrate the contention of the appellant, Liberty Bank, that in every instance the credit was extended to the Mutual Bank and that the notes of its customers were taken simply as collateral security. The advancements were made by the

Liberty Bank to the Mutual Bank as its line of credit permitted; the proceeds were placed to the credit of the Mutual Bank; the Mutual Bank checked them out with its own checks as it pleased; the Mutual Bank paid or had charged to its account the discount or interest upon the notes discounted; the Mutual Bank generally and specifically directed the Liberty Bank to charge to its account notes which were not paid or renewed at maturity; the Mutual Bank directed the Liberty Bank to notify it and not the makers of the notes of their maturities; the Mutual Bank time and again acknowledged and expressed appreciation of the accommodations extended to it. The Liberty Bank had no connection with the makers of the notes, did not know them, made no inquiry about them, but looked to the promises of the Mutual Bank with the warehouse receipts as collateral. This will appear conclusively from a review of the prior transactions connected with these so-called "cotton loans."

On March 10, 1917, the Mutual Bank forwarded to the Union National Bank notes of Easterling, $2,845, Hamer, $2,781, and J. B. McLaurin, $488, all secured by warehouse receipts and added: "The proceeds of which kindly place to our credit."

On September 27, 1917, the Mutual Bank forwarded to the Union National Bank note of E. D. Moore for $8,000, and added: "The proceeds of which kindly place to our credit." In the same letter the Mutual Bank asked for a lower rate than 6 per cent. so that they could make something out of the transactions.

On September 28, 1917, the Union National Bank advised the Mutual Bank that the Moore note had been discounted and the proceeds passed to their credit; that they would discount at 5½ per cent., the Mutual Bank of course making the difference, one-half of 1 per cent.

On December 20, 1917, the Mutual Bank forwarded to the Union National Bank a renewal note of E. D. Moore for $8,000, adding: "The proceeds of which kindly place

to our credit at the same time charging our account with maturing note of like amount."

On December 27, 1917, the Mutual Bank forwarded to the Union National Bank note of J. A. Stanton for $12,665, and added: "Kindly place proceeds to our credit."

On December 31, 1917, the Mutual Bank forwarded to the Union National Bank note McLaurin & Co. for $11,-200, and added: "Please place proceeds to our credit."

On January 22, 1918, the Mutual Bank forwarded to the Union National Bank renewal note of E. D. Moore, covering his notes for $8,000 and $13,500, and added: "Kindly charge us with the interest on said notes."

On February 20, 1918, the Mutual Bank forwarded to the Union National Bank renewal note of E. D. Moore for $20,000 directing that $1,500, to make up for the $8,000 and $13,500 notes, be charged to their account, and the interest for the renewal period.

On January 26, 1918, the Mutual Bank wrote the Union National Bank, inclosing a cotton note of J. B. Hamer for $3,327, saying: "Which we will be glad to have proceeds for." On March 22d, when this note fell due, the Mutual Bank forwarded a renewal note and added: "We will thank you to charge interest on same to our account."

On April 27, 1918, the Mutual Bank wrote the Union National Bank, directing them to charge the Exum note of $9,200 to their account, and asking them to handle a note of McLaurin & Co. for $10,000, charging the interest to their account.

On May 5, 1918, the Mutual Bank wrote the Union National Bank, inclosing notes of McLaurin & Co. $10,000, and Exum & Co., $4,500, adding: "We will have some of the notes reduced this month and we are sending draft of $12,000 to build up our balance to-day."

On July 22, 1918, the Mutual Bank enclosed to the Union Bank renewal note of McLaurin & Co. for $10,000, and adding: "Will thank you to charge interest to our account."

On June 21, 1918, the Mutual Bank forwarded to the Union National Bank renewal note of Stanton for $10,000. Stanton had paid $2,665 on his note of $12,665 to the Mutual Bank, who requested the Union National Bank to charge the entire note of $12,665 to them, adding: "We will thank you to charge interest and renewal to our account."

On June 24, 1918, the Union National Bank acknowledged receipt from the Mutual Bank of renewal note of E. D. Moore for $15,000, he evidently having paid the Mutual Bank $5,000, and charged the $20,000 note to the account of the Mutual Bank, together with $187.50 interest on the $15,000 renewal note.

On July 29, 1918, the Mutual Bank forwarded three notes to the Union National Bank, which they asked the bank to handle for them: J. L. McLaurin, $5,000, Sterling Hosiery Mill, $7,500, and McColl-Weatherly Co., $3,000— guaranteeing that they, the Mutual Bank, would keep 20 per cent. on deposit with the Union National Bank all the time, adding: "We will appreciate it if you can carry them for us under the circumstances."

On September 11, 1918, the Mutual Bank directed the Union National Bank to charge the B. E. Moore note for $3,300 to their account.

On October 25, 1918, the Mutual Bank wrote the Union National Bank: "We have written you repeatedly not to notify any of our customers but to send notices to us." They directed the Union National Bank to charge to their account note of J. L. McLaurin for $5,000, mailing to them the collateral warehouse receipts.

Constantly the Mutual Bank directed the other bank to charge to their account notes which had matured but not renewed, and to mail back to them the notes with the collateral warehouse receipts, a course of dealing incompatible with any other theory than that credit was being extended to the Mutual Bank and that that bank was the one being accommodated.

On October 18, 1918, the Mutual Bank wrote the Union National Bank to charge off the note of E. D. Moore for $15,000 and asking that they be allowed to renew the note of McLaurin & Co. for $10,000.

On October 25, 1918, the Union National Bank advised the Mutual Bank that they had charged the $15,000 Moore note to their account as per instructions, and that the renewal note of McLaurin & Co., would be discounted and the proceeds placed to the credit of the Mutual Bank. This was confirmed by letter of October 30th.

On October 31, 1918, the Mutual Bank wrote the Union National Bank, inclosing a cotton note of J. A. W. Moore for $30,000, stating: "Please handle this for us, as we did not expect to call on your good bank again but we expect to take this note up soon." The Union Bank reduced the application to $25,000, and thereupon the Mutual Bank wrote: "We appreciate this accommodation very much." On November 2d, the Mutual Bank wrote again thanking the Union National Bank for handling the Moore notes. On the 6th they wrote the bank again, thanking them for the low rate of interest on the Moore notes: "Thank you very much for your good bank giving us a rate of six per cent. on the J. A. W. Moore notes. It is splendid, and as soon as money loosens up we will show our appreciation."

On January 27, 1919, the Mutual Bank forwarded to the Union National Bank renewals of the Moore notes, and added: "Thanking you to charge our account with interest on the inclosed notes and to return the maturing notes of like amount to us."

On January 31, 1919, the Union National Bank wrote the Mutual Bank that the Moore notes had been discounted as per request, adding: "We have also received note of Mc Laurin & Co. for $2,500, with which we have credited your account and charged you $41.34 discount on same. We have also credited note of McColl-Weatherly Co. for

$300 and note of B. E. Moore for $2,500 and charged same to your account in accordance with your instructions."

On April 26, 1919, the Mutual Bank inclosed to the Union National Bank renewals of the Moore notes, adding: "Kindly place proceeds to our credit and charge our account with maturing notes of like amount."

On May 1, 1919, the Liberty Bank wrote the Mutual Bank that they had discounted the renewal notes of Moore, adding: "We have charged your account with $306.40 in payment interest and revenue stamps.."

On June 26, 1919, the Mutual Bank inclosed to Union National Bank renewal note of Moore, adding: "We would be glad if you will renew it, charging our account with interest."

On March 28, 1919, the Mutual Bank directed the Union National Bank to charge to their account the Usher note of $6,000, and to return the note to them "with its attending collateral," warehouse receipts, adding: "Thanking you for your help in the above matter."

On May 24, 1919, the Mutual Bank directed the Union National Bank to charge the note of McLaurin & Co. for $2,000 to their account.

On July 25, 1919, the Mutual Bank directed the Union National Bank to charge the note of B. E. Moore to their account, and repeated the injunction to notify them and not the makers of the notes.

On July 14, 1919, the Mutual Bank directed the Liberty Bank to charge the note of McLaurin & Co. for $10,000 to their account, and asked for a renewal of a note by them for $5,000; also to charge their account with the interest.

On May 21, 1919, the Mutual Bank made complaint that the Union National Bank had overcharged them interest on a note of Townsend for $10,000, which had been handled in the usual way.

On July 19, 1919, the Liberty Bank returned the canceled

note of Townsend, adding: "We have been very glad to have carried this for you."

On January 6, 1920, the Mutual Bank inclosed to the Liberty Bank note of E. D. Moore for $7,500, with the request that it be handled for 60 days at the best rate possible.

On January 8, 1920, the Liberty Bank advised the Mutual Bank that the E. D. Moore note for $7,500 had been discounted and the proceeds placed to their credit.

On March 2, 1920, the Mutual Bank forwarded to the Liberty Bank renewal note of E. D. Moore for $7,500, adding: "Will thank you to charge interest to our account."

On March 5, 1920, the Liberty Bank advised the Mutual Bank that the E. D. Moore renewal note had been discounted and placed to their credit, and the discount and stamps charged to their account.

On April 8, 1920, the Mutual Bank requested a return of the E. D. Moore note for $7,500, and directing that it be charged to their account, less rebate of interest allowable.

The cashier of the Liberty Bank also testified that the note of Sterling Hosiery Mill for $3,000 had been handled in the same way for the Mutual Bank, "which got the proceeds of it and paid the interest on it."

On January 5, 1920, the Mutual Bank forwarded to the Liberty Bank note of Sterling Hosiery Mill for $3,000, adding: "Will thank you to charge the interest to our account."

On January 9, 1920, the Mutual Bank forwarded to the Liberty Bank renewal note of Sterling Hosiery Mill for $6,500, adding: "We will not ask for renewal again and will take it up at maturity."

On January 12, 1920, the Liberty Bank advised the Mutual Bank that the Sterling renewal note had been handled as requested.

On April 1, 1920, the Mutual Bank advised the Liberty Bank that the maturity of the $3,000 Sterling note had been overlooked and asked that it be charged to their account.

On April 1, 1920, the Mutual Bank asked for a renewal of the $6,500 Sterling note, adding: "Kindly charge the interest to our account."

On April 28, 1920, the Mutual Bank asked that the Sterling note for $6,500 be charged to their account, less rebate of interest allowable.

On April 30, 1920, the Mutual Bank was advised that their request to charge the Sterling note for $6,500 to their account had been complied with.

With perhaps unnecessary and tiresome detail I have "piled Ossa upon Pelion" to demonstrate the course of dealing between the banks, which shows unmistakably the purpose of the Mutual Bank to secure credit for itself from the Union National Bank and the Liberty Bank, its successor. The money in every instance was passed to the credit of the Mutual Bank; it paid the discount, checked it out, and, when the notes were not paid at maturity or renewed, they were by general and special direction charged to the account of the Mutual Bank, in conformity with the general instructions given in the letter of October 15, 1918, and repeated in that of October 31, 1918, quoted above, and renewed in numerous specific instances above shown.

In a note to 12 L. R. A., 223, it is said:

"The doctrine seems to be universal that the one to whom and upon whose credit money is loaned or property advanced is liable for the debt regardless of the fact that his name may not appear on the security taken, if such security is regarded by the parties purely as collateral."

"A loan of money to a corporation will render it liable for the debt although the note of individuals, instead of the note of the corporation, was taken therefor because it was supposed to be better security. The test is, whether the note was received as consideration for the money or only as a security." Third Nat. Bank's Appeal, 141 Pa., 214; 21 A., 598; 12 L. R. A., 223.

In *Chemical Bank v. City Bank,* 156 Ill., 149; 40 N. E.,

328, one Braden, Cashier of the Chemical Bank, by prearrangement with the president of that bank, and for the use of the bank, made his personal note to a broker, Wetmore, for $5,000; Wetmore discounted the note at the City Bank, indorsing it without recourse, and the proceeds were passed to the credit of the Chemical Bank. The Court held that, while the Chemical Bank may not have been liable on the note of Braden, it was liable to the City Bank as for money had and received.

I do not think that it is necessary to hold the Mutual Bank as for money had and received, in view of the letters of October, 1918, above quoted, directing the correspondent bank to charge to its account all unpaid and unrenewed notes. They strike me as evidencing an express contract on the part of the Mutual Bank to take care of all notes discounted at its request by the Liberty Bank.

I think, therefore, that the course of dealing between the parties and the express promises and declarations of the Mutual Bank are sufficient to establish an express contract on its part to assume the primary obligation to repay the advances made to it by the Liberty Bank; but, if I should be in error as to this, I do not think that there can be the remotest doubt but that an implied contract to do so arose from such course of dealing, declarations, and conduct of the Mutual Bank.

In 13 C. J., 241, it is said:

"A contract implied in fact, or an implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or as it has been otherwise stated, where there are circumstances which according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract."

See, also, Elliott, Contracts, § 1355.

In *Dowling v. Charleston & W. C. R. Co.,* 105 S. C., 475; 81 S. E., 313, the Court said:

"The law implies a contract between persons where the ordinary course of  dealing between them, considered in the light of all the circumstances, reasonably warrants the inference that they mutually intended to contract."

2. As to the second ground: That the money was obtained by the Mutual Bank through the fraud of the president, in attaching to the note of McLaurin & Co. bogus warehouse receipts as pretended collateral security.

It is conceded that T. B. McLaurin, president of the Bennettsville Warehouse Company, issued warehouse receipts for 100 bales of cotton, to the firm of McLaurin & Co., of which he was manager and operator, and that he as president of the Mutual Bank attached them to the note of McLaurin & Co. as pretensively collateral security, and forwarded the note to the Liberty Bank for discount and application of the proceeds to the credit of the Mutual Bank. It is also conceded that there was not a bale of cotton at the time in the warehouse as represented by the warehouse receipts; that they were bogus and frauds. He was, of course, acting for his bank in a matter which concerned its interests and was for its benefit.  As president of the bank he received for the bank $10,000 of the Liberty Bank's money upon false representations, and if the bank be not liable upon an express or implied contract, it is unquestionably liable to the Liberty Bank for money had and received.

"Both at common law and under the Code, money paid under fraudulent misrepresentations· may be recovered on the common count for money had and received." *Winkler v. Jerrue* (Cal., 129 P., 804.

"If one wrongfully obtains the money of another, he may waive his damages and sue for money had and received." *Rhodes v. Jenkins,* 2 Ga. App., 475; 58 S. E., 897.

See, also, *Drake v. Whaley,* 35 S. C., 187; 14 S. E., 397. *Madden v. Watts,* 59 S. C., 81; 37 S. E., 209. *Luther v. Wheeler,* 73 S. C., 83; 52 S. E., 874; 6 Ann. Cas., 754; 4 L. R. A. (N. S.), 746. *Morvin v. McRae,* Rice, 171. *Peay v.*

*Aiken,* 1 Strob., 103.  *Buchanan v. Buchanan,* 4 Strob., 63. *O'Neall v. McBride,* 4 Rich Law., 434.  *Gilbert v. Ross,* 1 Strob., 287.

As to the unquestionable liability of the bank for the fraud of its president, see 1 Michie, Banks, § 112; 14a C. J., 493. *White Plains Coal Co. v. Teague,* 162 Ky., 11; 173 S. W., 360.  *Williams v. Hasshagen,* 166 Cal., 386; 137 P., 9. *Reynolds v. Witte,* 13 S. C., 536; Am. Rep., 678.  *Rucker v. Smoke,* 37 S. C., 377; 16 S. E., 40; 34 Am. St. Rep., 758. *Williams v. Tolbert,* 76 S. C., 211; 56 S. E., 908.  *Brown v. American Telephone Co.,* 82 S. C., 173; 63 S. E., 744. *Bickley v. Commercial Bank,* 39 S. C., 28; 17 S. E., 977; 39 Am. St. Rep., 721.

That, if the Mutual Bank is liable to the Liberty Bank for the amount represented by the note, the Liberty Bank had the right to offset the balance to the credit of the Mutual Bank on deposit, cannot be doubted. 31 Cyc., 821, 822; *Bank v. Thornton* (C. C.), 174 F., 752.  *Merchant's Nat. Bank v. Hall,* 83 N. Y., 338; 38 Am. Rep., 434.  *Hallowell v. Bank* 154 Mass., 359; 28 N. E., 281; 13 L. R. A., 315; 7 C. J., 654, 502; *Hiller v. Bank,* 92 S. C., 445; 75 S. E., 789; 96 S. C., 74; 79 S. E., 899.  *Southern Trust Co. v. Wilkins,* 101 S. C., 457; 86 S. E., 26; 34 Cyc., 193, 227.

I have not discussed the statute of frauds for the reason that in my opinon the liability of the bank is direct and primary.  No reason has been assigned for disallowing the claim of the Liberty Bank for attorneys' fees upon the note issued directly from the Mutual Bank to the Liberty Bank. And I think clearly it is entitled to them.

The judgment of this Court should be that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for further proceedings consistent herewith.